

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

ALIA AGHA,                        )
                                  )
                *Plaintiff*,      )
                                  )
V.                                )        Civil Action No. 1:14-cv-102
                                  )
SUNTRUST BANK,                    )
                                  )
                *Defendant*.      )
                                  )

### MEMORANDUM OPINION

This matter comes before the Court on Defendant SunTrust Bank's Motion for Summary

Judgment. Dkt. No. 38. The plaintiff filed her opposition, to which the defendant replied. The

Court heard oral argument on January 16, 2015. For the reasons stated in open court, as well as

those set forth below, the Court hereby GRANTS Defendant's Motion for Summary Judgment.

BACKGROUND[1]

This controversy arises out of a deaf woman's claim that her former employer

discriminated against her in violation of the Americans with Disabilities Act Amendments Act

("ADAAA") by wrongfully terminating her and failing to accommodate her needs. Plaintiff Alia

Agha was born partially deaf. She has 100% hearing loss in her right ear and 65% hearing loss

in her left ear. To communicate with others, she uses a hearing aid and has learned to read lips.

Agha was hired by Defendant SunTrust Bank "(SunTrust")" on December 24, 2012 as a Client

Service Specialist I. This position, according to SunTrust's official job description, entails duties

such as cash handling, processing teller transactions like deposits, and lobby management. As a

---

[1] Because this matter comes before the Court on summary judgment, the facts are presented in the light most
favorable to the Plaintiff.

newly hired employee, Agha had a 90-day probationary period with SunTrust, scheduled to end on March 24, 2013.

Before completing training, she worked at the "platform," or the lobby of the bank, where she would greet customers and lead them to their safe deposit boxes. After completing her training, Agha was placed on the teller line. As part of her teller duties, and despite her hearing impairment, she was required to answer telephone calls and communicate with customers through the drive-through intercom. Upon making mistakes at the drive-through teller window and being reprimanded by her supervisor Gian Carlo Briceno, she requested a TTY phone or some other method of aiding her to hear customers better. In response, Briceno told her to "tell the customers they have to speak louder, because you have a hearing disability." Agha Dep. 116:5–117:12.

In January and February 2013, Agha had thirteen instances of "differences" in her teller drawer; it was either short or over the amount of money that should have been in her drawer at the end of her shift. The shortages ranged from $0.30 to $59.90. She also had multiple transaction reversals during this period, including ten reversals for one client who needed to make a deposit and receive cash back. Agha also had difficulty counting coins, as she was not familiar with American currency and could not readily tell the difference between dimes and nickels.

Citing her failure to demonstrate "mastery of the teller line and constantly get[ting] stuck between transactions," SunTrust vice president Monique Marchese extended Agha's probationary period an additional thirty days to April 24, 2013. *See* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s SJ Mot."), Ex. D. She was placed on a Corrective Action Plan ("CAP"), which stated that if Agha's performance did not improve or "if other performance deficiencies

2

arise...further disciplinary actions, up to and including termination can occur at any time." *Id.*
The CAP also stated that Agha was "unable to answer phone calls without losing patience
because she does not understand what client's [sic] say to her." *Id.* Agha testified at her
deposition that upon being placed on the CAP, she again requested a TTY phone as well as to be
placed in a position without teller duties. These requests were not granted.

On March 5, 2013, Briceno displaced $1,995.00 from his cash drawer. According to
SunTrust, he had previously "sold" cash to Agha via the bank's processing system, and Agha did
not acknowledge the sale. Because of this, when Briceno later sold her $1,995, the transaction
was not properly processed. As a result, Briceno's drawer was short $1,995 and Agha's drawer
balanced. Agha disputes that any of this took place.

Six days later, on March 11, 2013, SunTrust's vice president of security Robert Tapscott
interrogated Briceno and then Agha regarding the missing $1,995. He allegedly accused Agha of
stealing the money and threatened her with arrest. The next day, Agha gave Marchese a written
letter requesting to be removed from the teller line. Marchese apparently threw the letter back at
her and told her to bring it to Briceno instead. On March 15, 2013, Marchese terminated Agha,
citing her numerous transaction errors, including the missing $1,995.

In February 2014, Agha filed her First Amended Complaint claiming discrimination and
wrongful termination under the ADAAA (Count I), failure to accommodate under the ADAAA
(Count II), retaliation under the ADAAA (Count III), and defamation per se (Count IV). Dkt.
No. 4. On April 25, 2014, the Court dismissed the defamation claim. Dkt. No. 15.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper
"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Finally, in making a summary judgment determination, the court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

DISCUSSION

SunTrust has moved for summary judgment on the remaining three counts of the Complaint. Dkt. No. 38. Resolution of the motion turns on the following issues: (1) whether Agha was meeting SunTrust's legitimate job performance expectations; (2) whether she could have performed the essential functions of her job with or without reasonable accommodation; and (3) whether the falsity of one of SunTrust's reasons for terminating Agha is sufficient to establish pretext.

I.  **Wrongful Termination Under the ADAAA (Count I)**

To survive summary judgment on a claim for wrongful termination under the ADAAA, a plaintiff must offer sufficient direct and indirect evidence of unlawful discrimination, or proceed under a burden-shifting method. *Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001) (citation omitted). Under the burden-shifting method, the plaintiff must make a prima facie showing that: (1) she was a "qualified individual with a disability"; (2) her employer took adverse action

4

against her; (3) at the time of the adverse action, she was performing her job at a level that met her employer's legitimate expectations; and (4) "the circumstances of [her] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (quoting *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 n. 9 (4th Cir.2004)).  SunTrust argues that Agha's claim fails on the first, third, and fourth prongs of the requisite prima facie showing.  The Court will address only the third prong, as it is dispositive of Count I.

Because Agha has not presented any direct or indirect evidence of discrimination, the Court must resolve the claim under the burden-shifting framework.  As above, Agha must offer evidence that she was meeting SunTrust's legitimate performance expectations.  *Reynolds*, 701 F.3d at 150.  Importantly, a plaintiff's own self-serving testimony cannot create a disputed issue of material fact on this issue because "[i]t is *the perception of the decision maker which is relevant*, not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) (emphasis added)); *accord King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

In this case, Agha had thirteen instances of shortages or overages in her teller drawer. She had multiple transaction reversals.  She had difficulty counting coins due to her unfamiliarity with American currency.  There were issues with her attendance and punctuality, and she needed constant reminders of what to do at the beginning of her shift.  Citing these issues with Agha's job performance, SunTrust placed her on a Corrective Action Plan.  The CAP extended her probationary period with the company an extra thirty days and required her to improve her performance.  Agha testified in her deposition that after being placed on the CAP, "I have been performing better, my money change and my overages and shorts are *really, really limited*

5

*nowadays*, I'm not making mistakes, I'm calm, I'm performing." Agha Dep. 222:1–5 (emphasis added). She has also offered the testimony of her supervisor Briceno for the proposition that she was never coached or counseled about her performance following the CAP. When asked whether he could pinpoint any negative feedback he gave to Agha post-CAP, he stated he could not recall. Briceno Dep. 64:6–9.

Agha's representation of her improvement post-CAP, however, is not entirely accurate. Briceno testified that post-CAP he provided "observation and feedback…right after she would make the transactions." Briceno Dep. 63:13–64:1. The feedback would be "good or bad" depending on what the observation was. *Id.* at 64:4–5. Perhaps the most compelling evidence of SunTrust's perception of whether its expectations were being met is Marchese's memorandum recommending Agha's termination. In the memo, Marchese stated "[b]ased on the number of teller transaction errors, I recommend her immediate termination…." Def.'s SJ Mot., Ex. H. Marchese listed the transaction involving the missing $1,995 as one of Agha's many teller transaction errors. *Id.*

Agha does not dispute her multiple errors and counseling by supervisors prior to the CAP. She also indirectly admitted her errors continued post-CAP by stating that her overages and shorts on her cash drawer were "really, really limited nowadays." Agha Dep. 222:1–5. Agha bears the burden to show that she was meeting her employer's expectations at the time of her discharge. The only such evidence she has offered on that point is her own testimony that she had been improving as well as her supervisor's testimony that he could not specifically recall what kind of negative feedback he gave her post-CAP. However, Agha mischaracterizes her supervisor's testimony. He did in fact testify to providing negative feedback. Briceno Dep. 63:13–64:5. Moreover, her own testimony does not satisfy her burden on this issue. *King*, 328

F.3d at 149. Accordingly, Agha has failed to make a prima facie showing on the third prong of her wrongful termination claim, and thus SunTrust is entitled to summary judgment on Count I.

**II.    Failure to Accommodate Under the ADAAA (Count II)**

To avoid summary judgment on her failure to accommodate claim under the ADAAA, Agha must make a prima facie showing that: (1) she was an "individual who had a disability within the meaning of the statute"; (2) SunTrust had notice of her disability; (3) with reasonable accommodation she could perform the essential functions of the position; and (4) SunTrust refused to make such accommodations. *Rhoads*, 257 F.3d at 387 n.11 (4th Cir. 2001) (citation omitted). "Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." *Haneke v. Mid-Atl. Capital Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005) (per curiam) (citing 29 C.F.R. § 1630.2(o)(3)). SunTrust argues that Agha has failed to make a sufficient showing on the third prong of her failure to accommodate claim—whether with reasonable accommodation she could perform the essential functions of her position. In deciding whether Agha has met her burden, the Court must make two inquiries: (1) what were the essential functions of Agha's job?; and (2) could she have performed those essential functions with reasonable accommodation?

i.    *What Were the Essential Functions of Agha's Job?*

"A job function is essential if it 'bears more than a marginal relationship to the job at issue.'" *Rohan*, 375 F.3d at 279 (quoting *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)). Other factors to consider include whether "(1) the employer's position exists to perform that function, (2) a limited number of employees are available to whom that function can be assigned, and (3) the employee was hired for her ability to perform that function because it requires highly specialized knowledge." *Griffin v. Prince William Health Sys.*, No.

7

1:10-cv-359, 2011 WL 1597508, at \*4 (E.D. Va. Apr. 26, 2011) (citing 29 C.F.R. §

1630.2(n)(2)). The Court "must also give 'consideration ... to the employer's judgment as to

what functions of a job are essential.'" *Id.* (citing 42 U.S.C. § 12111(8)). The amount of time

an employee spends performing the function and the "consequences of not requiring the

[employee] to perform the function" are also determinative factors. *Rorrer v. City of Stow*, 743

F.3d 1025, 1042 (6th Cir. 2014) (citing 29 C.F.R. § 1630.2(n)(3)(iii)–(iv)).

The parties dispute whether working the drive-through window was an essential function.

Agha only worked there a half hour each day. Agha Dep. 155:15–17. Apparently, the drive-

through position was regularly manned by one person, whom Agha would cover while she took a

lunch break. Agha Dep. 155:19–22. Thus, the consequences of not requiring her to work this

position for a half hour a day do not appear to be great, given that there were other tellers

available to cover. Moreover, the function is not listed in SunTrust's written job description.

Pl.'s Mem. Opp'n Mot. Summ. J. ("Pl.'s Opp'n"), Ex. E. Pursuant to the factors listed above,

viewing the facts in the light most favorable to Agha, it appears that working the drive-through

window was not an essential function of the job.

It is undisputed that teller transactions such as processing deposits, withdrawals,

payments, and transfers were essential functions of the job. *See* Marchese Dep. 46:1–54:20;

Agha Dep. 141:8–21. Agha also admits that cash handling and answering the phone were

essential functions. Agha Dep. 140:8–141:2; Compl. ¶ 30; Pl.'s Opp'n at 11 ("As part of her

duties, she was also to answer telephone calls within three phone rings"). All of the above

functions appear in the job description and are consistent with any person's notion of a teller's

responsibilities. Def.'s SJ Mot., Ex. B. Agha admits that she engaged in these functions on a

regular basis. Agha Dep. 140:8–141:21. Accordingly, these undisputed essential job functions

will form the basis of the Court's analysis on the third prong of her failure to accommodate claim.

ii.   *Could Agha Have Performed the Essential Functions of Her Job with Reasonable Accommodation?*

To satisfy her burden on her failure to accommodate claim, Agha must produce evidence that, with reasonable accommodation, she could perform the essential functions of her job. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013); *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002) ("The burden of identifying an accommodation that would allow a qualified individual to perform the job rests with the plaintiff."). An accommodation is not reasonable where it would require the employer to "shift[ the] essential functions of that employee's position to a different employee, or … create a new position." *Sydnor v. Fairfax Cnty., Va.*, No. 1:10-cv-934, 2011 WL 836948, at *8 (E.D. Va. March 3, 2011) (citations omitted). As above, the essential job functions of Agha's position were: (1) cash handling; (2) answering the phone; and (3) processing teller transactions. Her ability to perform each of these functions, with or without reasonable accommodation, will be addressed in turn.

Cash handling was unquestionably an essential function of Agha's job. The record reflects that she "need[ed] help counting coins." Def.'s SJ Mot., Ex. D. Agha admits she counted slowly, citing her unfamiliarity with American currency. Agha Dep. 187:15–189:1. She asserts that the only reason her coworkers helped her count coins, however, was due to *their* desire to leave work quickly because they could not do so until Agha had finished counting her drawer. Agha Dep. 188:15–189:6. She has also testified that she never asked for help counting coins. Agha Dep. 189:4–6. According to Agha, whose uncontradicted testimony the Court must defer to on summary judgment, she performed the essential function of cash handling, just not as

9

quickly as her co-workers would have liked.  The Court thus does not find this performance

deficiency to be dispositive of the issue, given Agha's explanation.

Answering the phone is another undisputed essential function of the job.  SunTrust

notably does not argue in its motion that Agha would not have been able to perform this essential

function with reasonable accommodation, and thus the Court will treat the issue as conceded.

Indeed, providing Agha with a TTY phone may have helped her perform this function,[2] as her

hearing aid caused static with the phone and made answering calls within the required three rings

difficult.  Agha Aff. ¶ 8.

Arguably the most essential function of Agha's job as a bank teller was the processing of

routine customer transactions such as deposits, withdrawals, payments, and transfers.  Agha

clearly struggled with these functions, as the CAP outlines and which she admits.  Def.'s SJ Mot,

Ex. D; Agha Dep. 175:19–176:8, 208:7–9, 281:11–14.  SunTrust contends that no reasonable

accommodation exists that would have alleviated her documented performance deficiencies in

this area because her disability was not the cause of those deficiencies.  Def.'s SJ Mot. at 15.

Viewing the facts in the light most favorable to Agha, however, there is at least some

evidence on the record that her hearing impairment was the root of her performance issues.  As

to the overages and shortages in her drawer, Agha testified that she told her supervisor:

> "[A]re you aware of why this is happening?  I have a hearing disability,
> I'm not able to hear the customers."  I said, "Is there any way you can
> help me by giving me a TTY phone or anything you can help me with
> to hear phone or customers?"

Agha Dep. 152:3–7.  She also testified that she "repeatedly told [her supervisor] that the reason

I'm making these mistakes is because I'm having a hard time hearing certain customers."  *Id.* at

---

[2]  A TTY phone is a device that apparently displays typed text on spools of paper or electronically.  It is unclear
from the pleadings, or the Court's cursory research, whether the person on the other end of the line must also have a
TTY phone.

153:7–10. Although Agha could not identify a specific teller transaction error that was related to her hearing impairment, she reasoned that it was because the errors were "not told to us immediately. If it was instantly pointed out, I would say, 'Oh, I didn't hear that customer, I'm sorry I made that mistake.'" *Id.* at 211:6–12.

Through her allegations in the Complaint and her deposition testimony, Agha has identified four possible accommodations that would have enabled her to perform her teller duties: (1) a sign at her teller station stating that she is hearing impaired and informing customers to speak loudly; (2) a TTY phone; (3) placement in a position besides the teller position; and (4) training for her supervisor on how to accommodate disabled employees. As will be explained below, a careful review of the record compels the conclusion that none of the proffered accommodations would have enabled Agha to perform the essential teller functions of her job.

Agha contends that a sign informing customers of her hearing impairment would have enabled her to perform her teller functions because "the customers would not get frustrated, they would have more patience with me, they would speak directly to me a little louder." Agha Dep. 144:11–145:6. Even if this accommodation had been provided, however, the Court is not convinced that she would have been able to perform her duties. Anyone who has held a bank account knows that basic teller transactions—deposits, withdrawals, and transfers—require the customer to fill out a slip that states the account number, the desired transaction, and the amount to be deposited, withdrawn, or transferred.[3] Counsel for SunTrust verified that this was indeed the process at the hearing. Agha's multiple instances of depositing funds into the wrong person's account using this paper-driven process clearly belie the assertion that her hearing impairment is to blame for her errors, as do the ten transaction reversals she had for the same client who merely

---

[3] Agha also processed utility payments for customers. Agha Dep. 141:13–19. It is likely that this also involved presenting a paper document, like a bill, from which she could read the information necessary for the transaction.

needed to deposit $83.39 into his account and receive $60 back in cash.  For similar reasons, a TTY phone would not have enabled her to properly process these transactions.  Given this record, Agha has failed to show that providing her with a sign or a TTY phone would have enabled her to perform these essential functions of her job.

Agha also claims that if SunTrust had trained her supervisor on how to accommodate disabled employees, he "would have been able to help me more."  Agha Dep. 146:16–20.  This may be true, but even assuming, *arguendo*, SunTrust failed to engage in the interactive process to find a reasonable accommodation for her, the burden nevertheless remains with Agha to identify a *specific* accommodation that would have enabled her to perform her teller duties.  *Wilson*, 717 F.3d at 347; *Lamb*, 33 F. App'x at 59.

Lastly, Agha points to her request to be placed in a position besides a teller position as a possible accommodation of her impairment.  As she testified at her deposition:

> I had asked if I'm—If there was any other position available apart from the teller position, not specifically the lobby, or any other opening that I could fit better and I could perform better since they had already pulled me up by the corrective action plan. And they said no.

Agha Dep. 224:20–225:4.  This Court has previously held that "[a]t the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, assignment to which would serve as a reasonable accommodation."  *Perrin v. Fennell*, No. 1:10-cv-810, 2011 WL 837008, at *7 (E.D. Va. Mar. 2, 2011) (quoting *Duvall v. Ga.–Pac. Consumer Prods.*, 607 F.3d 1255, 1263 (10th Cir. 2010)).  Although she proffers being responsible for "lobby management" as a reasonable accommodation, Agha has failed to produce evidence that this was a separate, vacant position.  Moreover, although she performed this duty for a period when she first started, she admits that it was not an essential function of her position.  Agha Dep.

144:2–7. In fact, her position did not entail *any* lobby responsibilities after she completed training. Agha Dep. 143:2–9. Thus limiting her duties to lobby management would necessarily require SunTrust to shift the essential teller functions of her position to a different employee. *Sydnor*, 2011 WL 836948, at \*8. This is not a reasonable accommodation and therefore was not required of SunTrust.

Based on the foregoing, it is evident that Agha has failed to identify any specific accommodation that an interactive process would have revealed and that would have enabled her to perform the essential functions of her job. *Wilson*, 7171 F.3d at 347.   Nor would the accommodations she actually did request—a TTY phone and placement in a different position— have enabled her to perform those functions.  She had documented difficulties in processing deposits and withdrawals, leading to countless errors and disgruntled customers.  She even admitted that the thirteen instances of differences in her drawer in just over a one-month period were not related to her hearing impairment.  When asked whether a sign would have mitigated these errors, she stated: "I'm not aware that these shortages or the over things would directly like—you know, are responsible for my not hearing or not knowing the work I was to perform. It had nothing to do with that." Agha Dep. 205:9–16.

Viewing the facts in the light most favorable to Agha, Agha may have been able to perform the essential functions of cash handling and answering the phone with reasonable accommodation.  The record makes clear, however, that no reasonable accommodation would have enabled her to perform the most essential function of her job—processing basic teller transactions.  Accordingly, Agha has failed to make a prima facie case, and summary judgment will be granted to SunTrust on Count II.

### III.    Retaliation Under the ADAAA (Count III)

SunTrust has also moved for summary judgment on Agha's retaliation claim, arguing that she cannot establish that its reasons for terminating her were pretext for a discriminatory animus. In its motion, SunTrust assumes, *arguendo*, that Agha has made a prima facie case of retaliation[4] and proceeds to address the next two steps of the analysis. Def.'s SJ Mot. at 26. To rebut the presumption of retaliation created by a prima facie showing, the employer must set forth a legitimate non-discriminatory reason for the employee's termination. *Pearlman*, 564 F. App'x at 719. If it does so, the plaintiff must then "demonstrate that the proffered reason is a pretext for forbidden retaliation." *Id.* (quoting *Rhoads*, 257 F.3d at 392). This Court has previously held that one way "[t]o create a factual issue as to pretext [is to] present sufficient evidence to create an inference that the proffered reason has no basis in fact." *Shortt v. Immigration Reform Law Inst.*, No. 1:11-cv-144, 2011 WL 4738657, at *10 (E.D. Va. Oct. 3, 2011), *aff'd*, 480 F. App'x 209 (4th Cir. 2012); *accord Harris v. Home Sales Co.*, 499 F. App'x 285, 293 (4th Cir. 2012) (affirming summary judgment for employer on issue of pretext because employee had "failed to put forth sufficient evidence showing that [the employer's] explanation for his demotion was false"). Importantly, a plaintiff's own testimony "cannot, absent objective corroboration, defeat summary judgment."

SunTrust claims that the only evidence on the record to establish pretext is Agha's "own self-serving testimony baldly concluding that she was retaliated against because she requested an accommodation." Def.'s SJ Mot. at 26. Agha testified as follows:

---

[4] To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to the employer's adverse action. *Pearlman v. Pritzker*, 564 F. App'x 716, 719 (4th Cir. 2014) (citing *Rhoads v. F.D.I.C.*, 257 F.3d 373, 391–92 (4th Cir. 2001)) (applying Title VII burden of proof standard to analogous Rehabilitation Act case because "[c]ourts routinely use Title VII precedent when construing the Americans with Disabilities Act").

> Q: Are you aware of any facts that support or suggest that the
> reason for your termination was in order to retaliate against you for
> making requests for reasonable accommodation?
> A: Yes.
> Q: What facts?
> A: In the sense that I wasn't accommodated when I made requests
> verbally.
> Q: Are you aware of any other facts other than the fact that you
> were not granted an accommodation?
> A: No.

Agha Dep. 231:16–232:8.  A plaintiff's own testimony, however, "cannot, absent objective

corroboration, defeat summary judgment." *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th

Cir. 2004).  More importantly, her assertions are purely speculative and, on the issue of pretext,

"[s]peculation is not enough." *Pearlman*, 564 F. App'x at 719.

Agha *has* put forth evidence, however, to demonstrate that at least one of the proffered

legitimate reasons for her termination—her involvement in a transaction resulting in a loss of

$1,995 to the bank—was false.  Def.'s SJ Mot. at 26.  The facts, viewed in the light most

favorable to Agha, are as follows: Tapscott, the vice president of security at SunTrust "did not

see any evidence of a sell cash" by Briceno to Agha.  Tapscott Dep. 75:6–8. Agha denies being

transferred the money as well.  Agha Dep. 225:13–226:6.  Following his investigation, Tapscott

concluded that Agha had not taken the $1,995 and classified the missing money as a "mysterious

loss."  Tapscott Dep. 86:18–87:820; Pl.'s Opp'n, Ex. I.

It is clear from the record that Agha's involvement in the $1,995 transaction was a major

reason for her termination.  *See* Def.'s SJ Mot., Ex. H ("On March 5, Alia had a processing

Teller Transaction Error which will result in a loss to the branch of $1995.00 therefore

termination is recommended.").  As above, Agha has produced sufficient evidence to raise an

inference that at least *this* reason for her termination "has no basis in fact." *Shortt*, 2011 WL

4738657, at *10.  However, multiple *other* legitimate reasons existed for terminating her.  In a

memorandum recommending her termination, Marchese articulated several of Agha's ongoing performance issues, including numerous teller transaction processing errors—*e.g.*, being over or short on her drawer—as well as her failure to adhere to "key operational control and policy violations." Def.'s SJ Mot., Ex. H. Because Agha has not produced any evidence to raise an inference that these other reasons for her termination were pretextual, SunTrust is entitled to summary judgment on Count III as well.

## ORDER

Based on the foregoing, SunTrust is entitled to summary judgment on all three remaining counts of the Complaint. Accordingly, it is hereby

ORDERED that Defendant SunTrust Bank's Motion for Summary Judgment (Dkt. No. 38) is GRANTED, and Counts I, II, and III are dismissed with prejudice.

February ___, 2015

Alexandria, Virginia

_____ /s/

Liam O'Grady
United States District Judge

16